ST GEORGE

CARLIE CHRISTENSEN, United States Attorney (No. 633)
BRENT D. WARD, Trial Attorney, U.S. Department of Justice (No. 3377)
D. LOREN WASHBURN, Assistant United States Attorney, (No. 10993)
ERIC G. BENSON, Assistant United States Attorney, (No. 10414)
PAUL D. KOHLER, Assistant United States Attorney, (No. 8224)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED
U.S. DISTRICT COURT

2011 JUN 15 P 4: 11

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | INDICTMENT |
| Plaintiff, | : | 18 U.S.C. § 1341 (Mail Fraud) |
| v. | : | |
| | | Case No. |
| JEREMY DAVID JOHNSON, and iWORKS, INC., | : | |
| | : | Case: 2:11-cr-00501 |
| Defendants. | | Assigned To : Stewart, Ted |
| | : | Assign. Date : 6/15/2011 |
| | | Description: USA v. |

The Grand Jury charges:

## I.  GENERAL ALLEGATIONS

### A.  Background

1. At all times relevant to this Indictment, defendant JEREMY DAVID

JOHNSON was an individual residing in St. George, Utah and was the sole owner,

officer, and mastermind of defendant iWORKS, INC.

2. At all times relevant to this indictment, defendant iWORKS, INC.

("iWORKS" or "defendant iWORKS") was a company incorporated in Utah in 2000. iWORKS' headquarters was located at 249 East Tabernacle Street, Suite 200, in St. George, Utah and it had a satellite office at 100 Wilshire Blvd, Suite 750, Santa Monica, California. Defendant iWORKS was in the business of Internet sales and marketing and did business under a host of names, including but not limited to Badcustomer.com, Blue Sky Marketing, Bottom Dollar, Business Funding Success, ClickNOffer, Easy Grant Finder, Fast Gov Grants, GrantAcademy.com, GrantCreator.com, Grant Professor, Grant Master, Grant Search, Grant Writer, Internet Economy, JRS Media Solutions, Net Pro Marketing, Online Auction Solutions, On Point Media Solutions, Quick Grant Pro, Raven Media, Rebate Millionaire, SBA, Track it Daily, Websavers, and 501c3.

3.     Defendant iWORKS marketed many products, including certain primary, or "core", products. These core products fell primarily, although not exclusively, into two lines: (a) software for securing government grants to pay for personal expenses, and (b) search-engine based money-making schemes. Defendant iWORKS marketed and sold these core products under hundreds of different names, including Cost Smashers, Express Business Funding, Everyday Legal Forms, Fast Funding Solutions, Funding Accelerator, Google Money Profit, Grant Resource Center, Network Agenda, Personal Wealth, and Rebate Millionaire. iWORKS' products were marketed and sold primarily on the Internet.

4.     Defendant iWORKS' core products were sold as part of a Negative Option

2

Continuity Program. A Negative Option Continuity Program is one where a consumer purchases a product and is automatically enrolled in a membership program that results in recurring charges to the consumer's credit card that continue until the consumer cancels the membership.

5.    Defendant iWORKS also marketed other products called "forced up-sells." Up-sells are sales of additional products and memberships unrelated to the primary, or core, product being sold. Forced up-sells are products that the defendants automatically bundled with the core product and from which consumers could opt out when signing up for the core product. Defendant iWorks sometimes sold its own product as forced upsells and sometimes sold other on-line sellers' products as forced up-sells on defendant iWorks web sites.

6.    Defendant iWORKS also provided many other services to other on-line sellers, including marketing the seller's products, processing their credit card and debit card charges for their products through Defendant iWORKS' merchant accounts, responding to inquiries from payment processors and banks, and handling customer services for these on-line sellers. In numerous instances Defendant iWORKS bundled its products as forced up-sells with the client's core product.

7.    Defendant iWORKS also used various payment processors to transact product sales via the Internet. These payment processors included, but were not limited to, First Data, ECHO, Global Payment Systems, Litle & Co., Moneris, Payment Tech,

Trident, and Vital, as well as several independent sales orginizations ("ISOs"), including but not limited to CardFlex, RDK, Inc., Merchant eSolutions, Pivotal Payments, PowerPay, and Swipe Merchant Solutions.  The ISOs acted as sales agents for the payment processors and merchant banks processing product sales on behalf of defendants JEREMY DAVID JOHNSON and iWORKS via the Internet.  Defendants JEREMY DAVID JOHNSON and iWORKS worked with these payment processors and ISOs to obtain numerous merchant bank accounts at various merchant banks, including but not limited to Wells Fargo, N.A., HSBC Bank USA, First Regional Bank, Harris National Association, and Columbus Bank and Trust Company.  Defendants JEREMY DAVID JOHNSON and iWORKS used these accounts with the payment processors and merchant banks to process the credit and debit card charges for defendant iWORKS' sale of products via the Internet.

8.      Defendants JEREMY DAVID JOHNSON and iWORKS also operated, through Bottom Dollar, a shell company, i.e. a company without any appreciable assets, the website www.badcustomer.com, which iWORKS identified as an Internet consumer blacklist to which iWORKS claimed to refer customers seeking charge backs, also claiming that referral to www.badcustomer.com would result in blocking the consumers from making any future purchases on-line.

9.      Defendant JEREMY DAVID JOHNSON also created companies, including Elite Debit, that used remotely-created payment orders to debit customers' bank accounts

4

for defendant iWORKS' product sales.

10.     Defendant JEREMY DAVID JOHNSON had signatory authority over numerous accounts at financial institutions containing funds from the sale of iWORKS products.

11.     Defendant iWORKS utilized at least 18 active depository accounts in its own name at six different banks.  Since 2006, Defendant iWORKS' sale of core products and up-sells (including forced up-sells) and consumer leads has generated more than $350 million in sales.

## B.     The Victims

12.     The victims include hundreds of thousands of consumers who, because of the fraudulent representations and omissions of the defendants and their co-conspirators, were unaware that when they agreed to a no-risk free trial of a core product and provided billing information for payment of a nominal fee for shipping and handling, such as $1.99 or $2.99, instead they were immediately and automatically enrolled in a membership plan, without their knowledge or consent, which resulted in charges to their accounts of a one-time fee of as much as $189.00 and recurring monthly charges of as much as $59.96 per month, or were fraudulently charged for forced up-sells without their knowledge or consent, or some other variation of such fraudulent transactions.

13.     The victims also included various merchant banks.  Merchant banks are financial institutions that have relationships with merchants, such as defendant iWORKS,

5

for the purpose of allowing the merchants to make sales and accept customer payments via credit and debit card. Merchant banks are affiliated with credit card networks, such as VISA and Mastercard. Merchants and merchant banks are assisted in their relationship by payment processors. Payment processors help to facilitate sales transactions conducted on the Internet. Merchant bank relationships are initiated via applications submitted to merchant banks by merchants and payment processors.

## II.   THE SCHEME TO DEFRAUD

14.   Beginning in about January 2006, and continuing up to January 2011, within the District of Utah and elsewhere, defendants JEREMY DAVID JOHNSON and iWORKS (hereinafter referred to by name or as "the defendants"), and other persons known and unknown to the Grand Jury (hereinafter referred to as "the co-conspirators") unlawfully, knowingly, and willfully devised a scheme and artifice to defraud and to obtain money from consumers by means of false and fraudulent pretenses, representations, and promises in violation of 18 U.S.C. § 1341(mail fraud), and in execution of the scheme and artifice to defraud consumers and banks, the defendants did the following:

In execution of the scheme and artifice to defraud consumers, the defendants knowingly and unlawfully deposited and caused others to deposit letters, correspondence and other matter to be sent and delivered by U.S. Mail, and took and received therefrom letters, correspondence, and other matter in violation of 18 U.S.C. § 1341.

## III. MANNER AND MEANS OF THE SCHEME TO DEFRAUD

**False Advertising**

15. As a part of the scheme, defendant iWORKS advertised its core products primarily by means of Internet web sites claiming to offer free CD-ROMs ("CDs") available for the cost of shipping and handling and promising consumers success in using the information on the CDs (a) to obtain "free money" from the government "fast" and "easy" by applying for government grants to pay for personal expenses, such as medical bills, utility bills, home remodeling costs, and home mortgage payments, and (b) to make large amounts of money through Internet search-engine advertising, web-based rebate programs and auctions, and by using newer Internet-based technologies such as Twitter. These advertisements were false and fraudulent in one or more ways, including the following: they (a) falsely described the products, (b) misrepresented the likelihood of success in using the products to obtain the intended results, (c) concealed the true amounts charged to consumers who ordered the products, (d) misrepresented the urgency of ordering the products, (e) contained testimonials that were fabricated and misleading, and (f) failed to disclose that the products were of little, if any, value.

16. Defendant iWORKS' advertising also failed to disclose, or disclosed in a manner calculated to deceive consumers, that furnishing personally identifiable information on defendant iWORKS' web site, including credit card information, even if only for the purpose of paying shipping and handling charges, automatically enrolled

7

consumers in Negative Option Continuity Programs and forced up-sells of other products.

17. Defendant iWORKS also advertised its products by means of spam emails containing false and fraudulent representations similar to those published on Internet web sites.

18. Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of false advertising on behalf of iWORKS, including the false claims and omissions referred to above.

19. The misrepresentations and omissions in defendant iWORKS' advertising concerned matters that were important to consumers in making a decision whether to order products from defendant iWORKS.

**False Testimonials**

20. As a part of the scheme, many of defendant iWORKS' advertisements included false testimonials encouraging consumers to claim the benefits of iWORKS' products. The testimonials often included statements proclaiming the effectiveness of products offered by defendant iWORKS, accompanied by a photograph of a person to whom the testimonial was attributed. These testimonials were false and fraudulent in one or more ways, including the following: they (a) were false and wholly fabricated, (b) seriously distorted and exaggerated the truth, (c) were attributed to persons who had not used the products, (d) were attributed to persons who knew nothing about iWORKS or its products, and (e) falsely represented that the products were endorsed by an expert.

8

21.     As a part of the scheme, defendant JEREMY DAVID JOHNSON, together with other co-conspirators, devised and implemented a scheme to fund a limited number of awards to government grant customers from defendant iWORKS' own resources. These awards ranged from in amounts ranging from $500.00 to as much as $5,000.00 in order to post testimonials attributed to them on iWORKS' web sites. In the end, some of the recipients of these awards were defendant iWORKS' employees' spouses and children. These testimonials falsely claimed that iWORKS' products could be used successfully to secure government grants for the purpose of paying personal expenses, even though the recipients of these awards had never used the grant product.

22.     Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of false testimonials on behalf of defendant iWORKS, including those referred to above.

23.     The misrepresentations and omissions in defendant iWORKS' testimonials concerned matters that were important to consumers in making a decision about ordering products from iWORKS.

**Phony Positive Reviews on the Internet**

24.     When the marketing practices of the defendants and their co-conspirators caused complaining customers to flood the Internet with negative comments about defendant iWORKS' products and marketing practices posted on web sites and blogs, the defendants and their co-conspirators sought to combat these unfavorable comments by

9

hiring third parties to create and post on the Internet positive articles and web pages. These positive articles and web pages represented, expressly or by implication, that they were independent reviews reflecting the opinions of unbiased consumers who had successfully used iWORKS' products to secure government grants to pay personal expenses or to earn substantial income through money-making programs.

25.    In fact, the positive articles and web pages about defendant iWORKS' grant and money-making programs were not independent at all.  Rather than reflecting the opinions of iWORKS customers about these grant and money-making products, these reviews were, instead,  created by defendants and their co-conspirators and agents and any representations that they were independent, fair, accurate, or unbiased were false.

**Continuity and Negative Option Program**

26.    Defendant iWORKS marketed its core products through a continuity and negative option continuity program where consumers ordered a so-called "free" product such as a CD for securing government grants or a CD for making money and disclosed their credit card billing information for the ostensible purpose of paying a nominal fee, such as $1.99 or $2.99, for shipping and handling.  As a part of the scheme, however, consumers were then immediately and automatically enrolled by Defendant iWORKS in a membership program without their knowledge or consent in which their credit cards were automatically charged with a one-time fee of as much as $189.00, as well as recurring membership fees of as much as $59.95 per month that continued until the consumer

10

actively canceled membership in the program.

27.     Because of the fraudulent advertising on defendant iWORKS' web sites, which was calculated to deceive consumers and conceal information from them, in most, if not all, cases consumers who ordered free products from defendant iWORKS were not aware of (a) their enrollment in the membership program, (b) the one-time fee, (c) the recurring monthly membership fees, or (d) the requirement to cancel the membership to avoid the fees.  Pursuant to the scheme, consumers became aware of these fraudulent charges only after receiving credit card statements showing the charges.

28.     Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of defendant iWORKS' Negative Option Continuity Program.

29.     The misrepresentations and omissions in defendant iWORKS' Negative Option Continuity Program were matters of importance to consumers in making a decision about ordering products from defendant iWORKS.

**Forced Up-sells**

30.     As a part of the scheme, defendant iWORKS frequently bundled products from its marketing partners with iWORKS' own core products.  Once consumers disclosed their credit card billing information for the purpose of ordering one of iWORKS' core products, the partners' products were automatically charged to consumers' credit card accounts as forced up-sells.

11

31.     Defendant iWORKS also arranged for its marketing partners to bundle iWORKS' core products with their own products and, once consumers' credit card billing information was furnished to the marketing partners for purchases of their products, defendant iWORKS' products were automatically charged to consumers' credit cards as forced up-sells.

32.     Defendant iWORKS also frequently used its own core products as forced up-sells, automatically enrolling consumers who ordered one core product in a membership program for another core product.

33.     These forced up-sells were charged to consumers' credit cards without their knowledge or consent, or were disclosed in a deceptive manner that was calculated to conceal them from consumers, and consumers became aware of them only after receiving credit card statements revealing charges for the forced up-sells.

34.     Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of defendant iWORKS' program of forced up-sells.

35.     The misrepresentations and omissions in defendant iWORKS' forced up-sell program were matters of importance to consumers in making a decision about ordering products from iWORKS.

**Refund and Charge-back Policy**

36.     As part of the scheme, and in order to minimize refunds and charge-backs,

defendants and their co-conspirators discouraged consumers from seeking refunds, or charge-backs, of fees fraudulently charged to their credit card accounts. When customers called and complained about unauthorized charges or debits on their statements, demanded cancellation of unauthorized memberships, and demanded refunds of charges, iWORKS' call center representatives attempted to rebut customers' claims and "resell" the memberships and other products. Customers were also notified that they would be reported to an Internet consumer blacklist at www.badcustomer.com, resulting in merchants blocking such customers from making further purchases on-line.

37.     In fact, pursuant to the scheme to defraud, the defendants and their co-conspirators and agents themselves owned and operated the web site www.badcustomer.com and any threat that iWORKS' customers who were referred there would be blacklisted and blocked from making further Internet purchases, except perhaps from defendant iWORKS itself, was false.

**Fraud in Merchant Bank Relationships**

38.     In order to conduct credit and debit card sales transactions on the Internet, a merchant, such as defendant iWORKS, is required to have an account, or relationship, with a with a merchant bank. Defendant iWORKS had numerous merchant bank accounts.

39.     The continuation of defendant iWORKS' merchant bank relationships depended on limiting charge-backs on defendant iWORKS' product sales. When

iWORKS' charge-back numbers with a merchant bank became too high, the merchant bank levied fines against defendant iWORKS and ultimately terminated the relationship. When a merchant relationship was terminated because of defendant iWORKS' excessive charge-backs, iWORKS was placed on a blacklist called the Terminated Merchant File, or "TMF". Once iWORKS was placed in the TMF, it was much more difficult for iWORKS or any company of which defendant JEREMY DAVID JOHNSON was a principal to open new merchant account with any bank. As more merchant banks terminated their relationship with defendant iWORKS, the company's very survival was threatened.

40.    After banks began terminating merchant accounts in the name of defendant iWORKS and other companies of which defendant JEREMY DAVID JOHNSON was an officer and began levying substantial fines against them because of their excessive charge-backs, as part of the scheme defendant JEREMY DAVID JOHNSON directed defendant iWORKS' employees to create numerous new corporations to act as "fronts" for applications for new merchant bank accounts. The establishment of new merchant accounts to replace the terminated ones would allow the defendants and their co-conspirators to continue to process credit and debit card sales of Defendant iWORKS' core products and up-sells and perpetuate the scheme and artifice to defraud.

41. The shell corporations formed to establish fraudulent merchant bank relationships included Blue Streak Processing, Business First, Cold Bay Media, Ebusiness

14

Success, Ecom Success, Money Harvest, Monroe Processing, Net Commerce, Premier Performance, Pro Internet Services, Revive Marketing, Summit Processing, Tranfirst, Tran Voyage, and Unlimited Processing.

42.     These new corporations were nothing more than shell companies with no operations that were formed for the fraudulent purpose of establishing new merchant bank accounts for defendant iWORKS, while concealing iWORKS' participation.  The named principals of these shell companies were employees of defendant iWORKS and associates of defendant JEREMY DAVID JOHNSON who acted merely as "straw principals."

**COUNT I**
**18 U.S.C. § 1341**
**(Mail Fraud)**

1.     The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1-42 above.

2.     Beginning in about January 2006 up to January 2011, defendant JEREMY DAVID JOHNSON, acting both alone in his capacity as sole owner of defendant iWORKS and for the benefit of iWORKS and also acting in concert with other persons known and unknown to the Grand Jury, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to obtain money from consumers by means of false and fraudulent pretenses, representations, and promises in connection with the advertising, marketing, distribution, and sale of products by defendant iWORKS, and for

the purpose of executing and attempting to execute the scheme and artifice to defraud,

defendants JEREMY DAVID JOHNSON and iWORKS used and caused to be used the

U.S. Mails for, among other things, the shipment of various products to consumers, with

the chart below showing such mailings to consumer victims as identified by their initials,

on or about the dates set forth below:

| Mailing | Shipped from | Shipped on or about | Received on or about | Consumer | Carrier |
|---------|-------------|---------------------|----------------------|----------|---------|
| "Fast Grants" CD | St. George, Utah | October 7, 2009 | October 9, 2009 | S. J. | U.S. Mail |

//

//

//

//

//

//

//

//

//

//

//

//

16

In violation of 18 U.S.C. § 1341.

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

CARLIE CHRISTENSEN
United States Attorney

_____
BRENT D. WARD
Trial Attorney, Criminal Division. United States Department of Justice
D. LOREN WASHBURN
ERIC G. BENSON
PAUL D. KOHLER
Assistant United States Attorneys

17