Kent R. Hart (#6242)
Executive Director
Parker Douglas (#8924)
*Pro Bono*
Utah Association of Criminal Defense Lawyers
46 West Broadway, Suite 230
Salt Lake City, Utah 84101
Telephone:  801.363.2976
Facsimile:  801.363-2978
*Counsel for Applicant, Amicus Curiae,*
*Utah Association of Criminal Defense Lawyers*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JEREMY JOHNSON and IWORKS, INC., <br><br> Defendants. | BRIEF OF UTAH ASSOCIATION OF CRIMINAL DEFENSE LAWYERS REGARDING PLAINTIFF'S MOTION FOR AN ORDER PURSUANT TO DUCrimR 57-6 <br><br> Case No. 2:11CR501-DN-PMW |

Utah Association of Criminal Defense
Lawyers, a Utah non-profit corporation,

    *Amicus Curiae*.

Pursuant to Federal Rule of Criminal Procedure 12 and DUCrimR 12-1, and the Court's

order dated February 25, 2013, *Amicus Curiae* Utah Association of Criminal Defense Lawyers

("UACDL") files this memorandum regarding the government's pending motion for order pursuant

to DUCrimR 57-6. Doc. #188 ("the Motion" or "Gov't Mot."). For the reasons set forth below, UACDL suggests that the Motion is without legal merit under the applicable federal rules, and that it suffers from significant constitutional infirmities. As a result, UACDL suggests that to grant the Motion would be improper as it is specifically postured, as to do so would be against legal authority, constitutional and other, as well as against sound public policy.

## DISCUSSION

**1.    Issues Raised in the Motion**

The government seeks an order from this Court, pursuant to DUCrimR 57-6, precluding extrajudicial statements of Mr. Johnson, his counsel, his affiliates, and all potential witnesses, alleging that Mr. Johnson has used various media to "publicly besmirch the integrity of the United States Attorney's Office for the District of Utah and, in particular to publicly accuse Mr. Ward of prosecutorial misconduct." Gov't Mot. at 10. The relief sought in the Motion is broad indeed, as the Motion seeks to prevent not only Mr. Johnson, but also "any" or "all potential witnesses" as well as Mr. Johnson's counsel, from making out of Court, or so-termed "extrajudicial statements," regarding the case, any or all of which (it is unclear in the Motion) the government contends has a likelihood of materially influencing the criminal proceeding or preventing a fair trial or impeding the administration of justice. Gov't Mot. at 1-2. As evidence in support of the relief it seeks, the government references the existence of two websites, alleged statements by Mr. Johnson to media outlets, a Facebook "Page,", two "Youtube" videos, and an email purportedly sent from Mr. Johnson to his counsel, but carbon copying the government (an email that apparently was not available, in whole or in part, for public viewing until the government publicly filed the Motion on PACER), all

of which appear to address purported motivations behind the indictment against Mr. Johnson. Gov't Br. at 2-10. In the Motion, the government provides no evidence to support the nature, scope and effects of the possible public reception of these various communications, or any evidence which identifies the manner in which the existence of such communications might materially influence the proceedings, or prevent a fair trial or impede the administration of justice. Instead, it appears the government is asking the Court to presume the mere specter of media attention is sufficient to justify the entry of a very broad gag order, not only on Mr. Johnson and his counsel, but also on any or all possible witnesses (who presumably remain unidentified or subject to later identification).

The Motion and the relief the government seeks, not only implicate precedents for application of DUCrimR 57-6, but also raise questions regarding the proper scope and application of the rule, as well as the relative burdens and evidentiary standards that should trigger the rule's application. The Motion also implicates core constitutional rights, including but not limited to: 1) the First Amendment rights of free expression and to petition the government for redress of grievances (which as a matter of first principles includes the right to petition publicly the executive branch and its functionaries); 2) the Fifth Amendment right to due process (as the wide scope of the relief requested in the Motion raises both First and Fifth Amendment vagueness concerns); and, 3) the Sixth Amendment rights to "speedy and public" trial, and assistance of counsel. U.S. Const. Amends. I, V, VI. With respect to the last right, a Supreme Court plurality stated the following that of necessity is at the core of this Court's treatment of the Motion: "An attorney's duties do not begin inside the courtroom door . . . . [A]n attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment . . . including an attempt to

demonstrate in the court of public opinion that the client does not deserve to be tried." *Gentile v. State Bar*, 501 U.S. 1030, 1043 (1991) (plurality opinion of Kennedy, J.).  Whether such a duty is implicated in this case, or would be impacted by the Court's treatment of the Motion, is an open matter.

The purpose of the memorandum is to give the Court assistance in ascertaining a complete understanding of the possible impact of the application and scope of the relief requested in the Motion.  UACDL further seeks to provide this Court a consideration of the potential precedential impact of granting such motions for all accused persons in federal proceedings in the District of Utah.  The following is covered by this memorandum: 1) an historical and plain reading of the rule and the constitutional implications spawned by the Motion; 2) an outline of legally permissible and impermissible applications of the local rule; and, 3) a discussion of the important practical questions of relative burdens of the parties, evidentiary standards and narrow tailoring, all of which are of necessity raised by the relief sought in the government's Motion.

**2.     Legal Standards**

A.     <u>The Local Rules</u>

DUCrimR 57-6 codifies the inherent power of this Court to ensure that criminal matters are processed in conformance with the constitutional safeguards detailed elsewhere in this brief.  It reads:

> In a criminal matter that is likely to be widely publicized, the court, during the investigation or at any other time, may issue an order governing extrajudicial statements by *parties* or *witnesses* which have a *substantial likelihood* of *materially influencing* a criminal proceeding or *preventing* a fair trial or *impeding* the administration of justice.

DUCrimR 57-6 (emphasis added).

As is fundamental and longstanding in canons of judicial construction, this rule must be read in the context of the other rules applicable to the same subject. *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1849) ("we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"). Because "words and people are known by their companions[,]" *Williams v. Taylor*, 529 U.S. 420, 435-36 (2000) (internal citation and quotations omitted), interpretation of law is the same for rules as it is in statutory construction, and "[i]t is 'a fundamental canon of . . . construction that the words of a [provision] must be read in their context and with a view to their place in the overall'" scheme. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

DUCrimR 57-6 is mirrored in DUCrimR 57-7, which regulates "Public Communications Concerning Criminal Matters", and provides in its policy statement the following restriction on participating council: "A government or defense attorney . . . may not disseminate . . . information, statement, or other matter which will have a substantial likelihood of preventing a fair trial or directly impeding the due administration of justice." DUCrimR 57-7(a). It also restricts court personnel from disclosing "information relating to a pending investigation or prosecution that is not part of the public record, including information concerning grand jury proceedings or hearings and argument held outside the presence of the public." *Id.* As such, local rule 57 by its plain language covers lawyers, who are officers of the court, as well as court personnel, from disclosing material

5

which may impede the fair trial rights of the accused, either by way of disclosing information that could not be admissible at trial or otherwise compromise the security of a fair trial.  Omitted from it plain language are the accused or other non-court personnel such as actual or potential witnesses.

As discussed below, lawyers, as members of the bar and officers of the court, have restrictions on permissible speech regarding matters before the court, due both to their governing ethical rules and to their status as officers of the court.  The balance of Rule 57-7 covers what may be said by lawyers who represent parties, and delineates permissible and impermissible statements in subsections (b) and (c).  Under DUCrimR 57-7(b), a "government or defense attorney may:"

(1) quote without comment from the public record;
(2) inform the public of the general *scope* of an investigation or prosecution
   (including the name of the victim if not prohibited by law);
(3) warn the public of danger;
(4) solicit the help of the public in apprehending a suspect or fugitive or in procuring
   evidence;
(5) identify an accused by name, age, residence, occupation, and family status;
(6) announce *the circumstances of arrest* (including time, place, resistance, pursuit,
   use of weapons, arresting officer, length of investigation) and the *seizure of
   physical evidence* (including description of objects seized); and
(7) *note the accused's denial of the charges and the accused's intent to seek an
   acquittal.*

DUCrimR 57-7(b)(emphasis added).  Subsection "(c): Impermissible Communications by Attorneys", provides:

(1) A government attorney must make no reference to an accused's prior criminal record, *except to the extent that it may be relevant to an explanation of the charges*, confessions, or results of tests, or *disclose any proposed evidence* which the attorney knows or should know *would not be admissible at trial*, or render an opinion prior to or during trial as to the attorney's *personal belief of the accused's guilt or innocence.*

(2) A defense attorney must not (i) render any *personal belief or opinion prior to*

> *or during trial as to accused's guilt or innocence*, (ii) *make any statement attributing the commission of the crime charged to a specific person other than the defendant*, or (iii) disclose evidence that the attorney knows or should know would not be admissible at trial, which evidence could materially affect the fairness of the proceedings.

DUCrimR 57-7(c)(emphasis added).   At least a few things are notable about the emphasized portions of the rules.

First, while a lawyer may not articulate a "personal belief or opinion" regarding "innocence or guilt," the plain language of the rules permit a prosecutor to comment on the "scope" of the investigation, note the "circumstances of the [accused's] arrest" and the "seizure of physical evidence[,]" even though the prosecutor would not necessarily know at the time of an initial press release if seized physical evidence would be admissible at trial.   Thus, while a prosecutor is prohibited under the rule from rendering a "personal opinion" regarding "guilt or innocence," the permissible commentary under the rule's plain language allow discussion of "scope" of "investigation and prosecution," detailed (because restrictions are undefined) discussion of the "circumstances of arrest," and (because it may not be known until a motion to suppress is brought) detailed discussion of physical evidence seized.   Practically speaking, the only thing that is impermissible under the two sections read in accord, is a prosecutor's "personal belief of the accused's innocence or guilt."[1]

---

[1]  Restatement (Third) of the Law Governing Lawyers § 109(2) would put limits on this ability by prosecutors: "A prosecutor must, except for statements necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law-enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." *Id*. The Utah Rules of Professional Responsibility contain no such restrictions on prosecutor statements. *Compare* Restatement (Third) of the Law Governing Lawyers § 109(2) *with* Utah Rule of Professional Responsibility

Similar ambiguity renders the prohibitions on defense lawyer communications hopelessly ambiguous and ineffective. A defense lawyer, remarking on the "scope" of "investigation," "circumstances of arrest," "seizure of physical evidence," while "not[ing] the accused's denial of the charges and the accused's intent to seek an acquittal," may not offer a "personal belief of the accused's innocence or guilt," but the permissible communications, especially granted with respect to undefined "circumstance" and "scope," allow ample and relatively objective commentary on the strength of the case, as the lawyer mentions the accused's denial and intention to seek acquittal.

As such, the permissible commentary allowed by the rules permit great leeway, unless and until the court makes a determination that the rules have been breached, as DUCrimR 57-7 provides: "Any attorney who violates the provisions of sections (a) or (c) of this rule will be subject to such sanctions as the court deems just and proper. Such discipline may be enterd by the court sua sponte

---

3.8.
      Similarly, regarding ethical rules in Utah governing lawyers on pretrial publicity, the rules merely provide:

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter. ... *Notwithstanding[,] a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.*

Utah Rule of Professional Conduct 3.6(a), (c) (emphasis added). Thus, so long as a lawyer is not responsible for the perceived prejudicial effect of pretrial publicity, a lawyer is permitted to make public statements he or she deem necessary to mitigate recent adverse publicity so long as the lawyer or their client did not initiate the publicity. This final question will as a practical matter always be at issue if there have been press releases about an alleged crime with any detail regarding the accused.

or upon motion of a party." DUCrimR 57-7(d).  As the sanctions are undefined, theoretically (and in fact until tested in law), the sanctions are only capped by the prohibition on "cruel and unusual punishment" and "excessive fines" clauses of the Eighth Amendment to the Constitution, and the common law limits on criminal contempt found in federal caselaw.

Consequently, the only meaningful limits on public commentary by counsel, arise when either a counsel for a party assert, as in the Motion before the Court, or the Court finds sua sponte, that the public commentary has a "substantial likelihood of materially influencing a criminal proceeding or preventing a fair trial or impeding the administration of justice." DUCrimR 57-6, 57-7(a).  As discussed below, this finding and the burdens associated with it are not governed with precision in the leading cases.  For instance, in a recent high profile case in this district, *United States v. Mitchell*, 2:08CR125, the government took the position that a fair trial could be had in spite of seeming media saturation of the event, and a showing by defense counsel that seventy percent of the possible venire had concluded pretrial that the accused was guilty, the remaining possible venire pool was so hostile to the insanity defense that only six percent of the pool likely remained untainted by predisposition or bias due to pretrial publicity or other sources of bias. *See United States v. Mitchell*, 2:08-cr-125, Defendant's Supplemental Memorandum Re: Change of Venue, Doc. # 320.  The government there maintained that a fair trial could be had absent a showing of presumed prejudice that would have allowed the defendant post-conviction relief under habeas corpus standards.  *See United States v. Mitchell*, 2:08-cr-125, United States' Opposition to Defendant's Motion to Change Venue, Doc. #272.  The government later maintained that any possible taint to the jury pool, even under such circumstances, could be cured with proper voir dire and jury

instructions. *See   United States v. Mitchell*, 2:08-cr-125, United States's Supplemental Memorandum Re: Change of Venue, Doc. #319.  Given such a position, it is curious that the government now believes that a gag order is necessary to preserve fair trial protections in this matter, given the comparatively minuscule amount of coverage cited in the Motion, and, as discussed below, the fact that the government has in some instances not linked its evidence either to Mr. Johnson or Mr. Johnson's counsel, and the fact that it has offered no evidence as all, except the description of the communications themselves, to support the claim that the communications have been received by anyone such that they pose "substantial likelihood of materially influencing a criminal proceeding or preventing a fair trial or impeding the administration of justice." DUCrimR 57-6.  It is notable in the case cited, that the Court found that it could guarantee, in spite of media saturation and demonstrated actual bias, and in a manner requested by the government, that a fair trial could be secured through the use of jury questionnaire and voir dire.  *See United States v. Mitchell*, 752 F.Supp.2d 1216, 1228-29 (D. Utah 2010).

Moreover, such was the conclusion of this Court in *United States v. Koeber*, No. 2:09-cr-302, 2012 WL 396 WL 3964829, *9 (D. Utah Sept. 11, 2012), cited in the government's brief for its position on this Motion.  Gov't Mot. at 11.  The government's quotation of that case is for the proposition that "[t]rial courts have 'broad discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to assure a fair trial.'" Gov't Mot. at 11 (citing *Koeber* at *9). Perhaps tellingly, the government selectively quotes *Koeber*, as the sentence in the case preceding the quote in the government's brief reads: "Pretrial publicity impacts a defendant's rights 'only when it dictates the community's opinon as to guilt or innocence."  *Koeber*, 2012 WL 396 WL 3964829,

*9 (quoting *United States v. Abello-Silva*, 948 F.2d 1168, 1177 (10th Cir. 1991)).  The sentence following the government's selection reads: "Generally, however, the proper occasion for determining juror impartiality is upon voir dire examination." *Id.* (internal quotations and citations omitted).  *Amicus* are certain the Court can evaluate this use precedent, but will state the obvious: that the *Koeber* Court's observation is in accord with the position the government has pressed previously in cases involving publicity.

To be fair, however, the government's Motion is directed at statements in the media, some though not all attributable to Mr. Johnson, and the question remains whether the government has met its burden to show that a fair trial might be prevented, the proceeding materially influence, or the administration of justice impeded by such communications such that those interests outweigh the constitutional interests and rights of those persons subject to a gag order.  To parse that question is the purpose of the next section.

B.      The Constitutional Issues Implicated in any "Gag" Order

The Motion requests a Court order that would be applicable to Mr. Johnson, his counsel, and any potential witness.  The constitutional protections accorded these three categories of persons are very different and the following discussion in part details those distinctions.  The legal standards applicable to the Motion vary according to the nature of the communication alleged to challenge the legal process and the party against whom Court regulation via gag order is sought.  For instance, as discussed above, while counsel have duties imposes via ethical rules and by rules that apply to them by virtue of their position as officers of the Court, defendants and non-party individuals occupy no such position that exposes them to extra regulation of speech.  Counsel for Mr. Johnson have already

11

pointed out that the Motion is impermissibly overbroad as it seeks to regulate unnamed and unknown witnesses who may not have any notice that they could or would be subject to an order, if issued by the Court.  Doc. #209 at 3-4.  This point is so clear that *Amicus* cannot need not add more to the defense counsel's clear and succinct treatment, as it is certain that such an order would not provide "fair notice to those to whom it is directed."  *Gentile*, 501 U.S. at 1048 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972))(internal brackets and quotation marks omitted).  Yet, because the aims of the Motion, and its disposition of the Court, have possible precedential implications to the interests identified by *Amicus*, the following section details the remaining general constitutional standards for permissible speech regulations for lawyers and non-lawyers, parties and non-parties.

### 1.    The Right to Petition: The General Right of Individual, Non-Lawyers

As an initial matter, the Court should recognize that the speech at issue in the Motion is properly characterized as complaints against perceived abuses of government action in the form of the Executive Branch's exercise of prosecutorial power.[2]  Such complaints receive great constitutional protection, though they may be fettered by civil liability and other regulation in some cases as discussed below.  Because the presumption of innocence is "constitutionally rooted," *Cool v. United States*, 409 U.S. 100, 104 (1972), and it is "axiomatic and elementary, and [because the presumption's] enforcement lies at the foundation of the administration of our criminal law[,]" *Coffin v. United States*, 156 U.S. 432, 453 (1895), the accused, as noted above in the discussion of

---

[2]  Whether or not such complaints have an actual basis in truth is not relevant to the baseline inquiry, though such an inquiry, as discussed below, may have relevance to the issue of potential civil liability.

the local rules, is always entitled to vigorously and persistently maintain their innocence, as well as their presumption of innocence until proven guilty, both in proceedings before the Court and in their public activities after they are accused.  This latter aspect of right is, in part, grounded and secured in the First Amendment right to redress, and is part of a right to preserve and defend one's integrity in the face of indictment.

The First Amendment guarantees "the right of the people . . . to petition the Government for redress of grievances."  U.S. Const. Amend. I.  The right of a citizen to publicly maintain their innocence in the face of criminal charges brought by the government has been a most fundamental aspect of the right to petition for redress of grievances, as such right was at the core of the right to withstand government intrusion on individual liberty first recognized in Anglo-American law with the signing of the Magna Carta.  When King John signed the Magna Carta in 1215, he established the foundation from which comes our modern right of petition for redress of grievances.  C. Stephenson & F. Marcham, *Sources of English Constitutional History,* 125 (2d ed. 1972).  Originally both houses of the English Parliament had this right to petition the Crown for redress of grievances, but as Commons became more important than the House of Lords, Commons began to receive petitions for redress in the form of written plea and public outcry in assembly, and Commons, rather than the Crown, became the focus of both direct and public petitions for redress; as a result of this historical change, the right to petition Commons, as an extension of the original Magna Carta provision, was later guaranteed to every commoner, and subsequently direct and public petition against perceived wrongful actions of the Crown (the historical forerunner of our Executive Branch and its prosecutorial powers) was secured as a right at common law.  4 Ronald D. Rotunda

& John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* §§ 20.53-20.55; Leonard W. Levy, *Origins of the Bill of Rights*, 4-5, 50 (New Haven: Yale University Press, 1999); *see also* Akhil Reed Amar, The Bill of Rights, 241-242 (New Haven: Yale University Press, 1998) (discussing importance of securing right of public petition and assembly in Reconstruction Era in context of prosecutions under the "Black Codes"). Thus direct and public voicing of grievances, against prosecutorial actions against individuals, became a fundament of our First Amendment. *McDonald v. Smith*, 472 U.S. 479, 482-83 (1985) (tracing same history as root for public petition in the First Amendment to the Constitution of the United States); *see also* 1 Annals Cong. 738 (1789) (James Madison noting same grounding in post-Magna Carta common law as antecedent for First Amendment right of petition).

The form of such public petition is rarely, if ever, popular with prosecuting authority–as it surely was not for Crown prosecutors subsequent to the Magna Carta or for Southern prosecutors during Reconstruction; yet it is the act of such petition (and perhaps its unpopularity), whether directly or through public plea, that is at issue here, as the airing of grievance against prosecution, and possible restraint of that activity, is the issue before the Court. Whether the communicative petition is face to face, presented in person, or in communication through available media, the Supreme Court has recognized that "[t]he very idea of a government republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and petition for redress of grievances." *Unites States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 552 (1876). As such, the right to petition publicly is "among the most precious of the liberties guaranteed by the Bill of Rights," *Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222 (1967), and

14

except in the most extreme circumstances citizens cannot be punished for exercising this right "without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions," *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).  Of special relevance to the issues raised by the government's Motion, the Supreme Court has expressly observed that as with the freedoms of speech and press, the exercise of the right to petition "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and the occasionally "erroneous statement is inevitable." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964).  "The First Amendment requires that we extend substantial breathing space to such expressions, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill would-be critics of official conduct from voicing their criticism." *McDonald*, 472 U.S. at 486-87 (internal quotations, citations and ellipses omitted).

Here, we have an instance where Mr. Johnson, a non-lawyer party, made statements critical of the government's prosecuting authority.  As described above, that act receives great constitutional respect and protection.  It is not, however, unfettered from any regulation, and some regulation does not offend the constitution and the rights and protections it enshrines.  First, the right to petition clause does not insulate Mr. Johnson from civil liability for slander and libel, and perhaps tort liability for invasion of privacy: false light, though government functionaries such as prosecutors and public officials enjoy less protection under the law of torts.  *McDonald*, 472 U.S. at 483-85.  Second, if the government can meet its burden to show that the communications of which it complains may materially influence the criminal proceeding or prevent a fair trial or impede the administration of justice, DUCrimR 57-6, then they may be entitled to a gag order as well regarding

15

Mr. Johnson.  Because the character of the communications complained of by the government are related to the right to the petition, the standards with respect to the propriety of a gag order on Mr. Johnson are in uncharted waters at best; a plurality of the *Gentile* Court observed the following with respect to such statements by counsel: "Petitioner was disciplined because he proclaimed to the community what he thought to be a misuse of the prosecutorial and police powers.  Wide-open balancing of interests is not appropriate in this context."  501 U.S. at 1052.  As discussed above, because the accused can insist upon and is presumed to be innocent until proven otherwise, it would appear that his or her right to petition and protest perceived abuses would be regulated, if at all, with utmost caution. With this caveat in mind, *Amicus* next offers the Court its best interpretation of the burden the government must meet to succeed on its Motion with respect to Mr. Johnson and Mr. Johnson's counsel.  *Amicus* do not address the standard for the Motion's request for an order against potential witnesses as such an order would be void for vagueness as addressed earlier.

2.      *Gag Orders and the First Amendment: General Standards for Lawyers and Non-Lawyers*

To provide the standard to meet its burden, the government presses the language of the local rule itself, and cites the Court primarily to *United States v. Tijerina*, 412 F.2d 661 (10th Cir. 1969), *United States v. Fieger*, No 07-cr-20414, 2008 WL 659767 (E.D. Mich. Mar. 11, 2008), and *Gentile v. State Bar*, 501 U.S. 1030 (1991).  There are distinct problems with each of those cases as support for the government's Motion.

First, regarding *Fieger*, this Court should first note that the government in that case was relieved of its burden to demonstrate any alleged effect of the statements at issue because the

defendant in that case "failed to object to the . . . finding that his extrajudicial statements to the press" had a "substantial likelihood of materially prejudicing' a fair trial." 2008 WL 659 WL 659767 at *2.  As such, the case can serve as no support for the government's Motion with respect to its burden, especially regarding the government's claim that such an order is appropriate in this case because "Defendant's media messages go even beyond those in . . . *Fieger*."  Gov't Mot. at 13.  The court in *Fieger* made no finding regarding "substantial likelihood" because, as just described, Fieger had waived his right to challenge the finding, and so the case is useless to this Court as a benchmark for such an evaluation.  In short, *Fieger* offers no oranges to compare to the apples here.

Similarly unhelpful to the government's position is the case of *United States v. Tijerina*, 412 F.2d 661 (10th Cir. 1969).  The case is unhelpful for the simple fact that *Tijerina* involved a the appeal of a criminal contempt violation on a gag order that had already been entered and breached–hence the issue of criminal contempt; the petitioners in *Tijerina* were, somewhat analogous to the position of Mr. Fieger, fighting over whether their speech could be regulated when they had already lost the chance, as *they had agreed that their speech should be regulated because the* Tijerina *petitioners had asked for the gag order in the first place. Id.* at 666.  As the *Tijerina* Court observed: "None [of the cases cited by petitioners] considered a situation where the contempt arose from the violation of an order.  They were all concerned with extrajudicial statements which, in the absence of a prohibitive order, were said to obstruct the administration of justice and have an adverse effect on the right to a fair trial.  Here we have the violation of a court order." *Id*.  In other words, *Tijerina* offers this Court no guidance regarding whether the statements there would have been sufficient to support the request for a gag order; the petitioners themselves asked for a gag

order, received it, and then breached it themselves.  *Id*.  The *Tijerina* Court therefore never had to consider whether the statements were sufficient cause to implement such an order; other than offer general observations obvious to this Court regarding the general interests in fair trials in the face of publicity, the case offers no guidance regarding what showing is sufficient to trigger such an order. Again, the government's observation that "Defendant's media messages go even beyond those in . . . *Tijerina*[,]" Gov't Mot. at 13, is of no significance or relevance to the issue before the Court here because the *Tijerina* Court was not evaluating whether such statements were sufficient to trigger a the imposition of a gag order in the first place.  As with *Fieger*, *Tijerina* offers no oranges to compare to the apples here.

*Gentile v. State Bar*, 501 U.S. 1030 (1991), does offer some guidance to this Court, particularly regarding the possible regulation of potential speech by lawyers on pending criminal matters.  Because it has to do with the regulation of lawyers speech, and the government's Motion deals with speech some of which originated with Mr. Johnson, and none of which is alleged to have been purposefully circulated by counsel, and because it seems Mr. Johnson's counsel have agreed that an order may be appropriate, to a certain extent, with respect to counsel,[3] *Amicus* will deal with the general standard applicable when considering gag orders with respect to individual defendants and then counsel generally.

In general, a court order that restricts trial participants' communications with the media will

---

[3] Counsel for Mr. Johnson offer the observation that such an order may be "appropriate" to ensure Mr. Johnson's Sixth Amendment right to a fair trial, Doc. # 209 at 2-3, and offer some suggested restrictions of their own, *id*. at 4-5.  *Amicus* has no interest in and take no position on those arguments advanced by Mr. Johnson's counsel, as *Amicus* has not asked for or received leave to comment on them.

be upheld only if the government can establish that activity restrained poses either clear and present danger or serious and imminent threat to a protected competing interest; the government must also establish that the order has been narrowly drawn and contains the least restrictive means available. U.S. Const. Amend. I; *United States v. Aldawsari*, 683 F.3d 660 (5th Cir. 2012); *see also United States v. Brown*, 218 F.3d 415, 423-428-31 (5th Cir. 2000) (collecting and surveying standards and burdens in federal gag order decisions). Gag orders are unquestionably "prior restraints" on speech and therefore "constitute [a] most serious and least tolerable infringement" on the freedom of speech and, as such, "bear 'a heavy presumption against [their] constitutional validity[,]'" and must be narrowly tailored. *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (Sotomayor, J.) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). Such orders must contain "factual findings that publicity [complained of] would impair defendant's Sixth Amendment Right to a fair trial." *Id.* at 311. Upon such findings, a Court may enter such a gag order generally if it finds a "substantial likelihood" that the communications complained of would prevent a fair trial. *Brown*, 218 U.S. at 427-28. There is a question of whether the government's burden is to show a "clear and present danger" that such communications threaten a fair trial or whether a somewhat lesser "substantial likelihood" that such a threat exists. *Id*. at 427-28 (collecting cases). While it seems that the "clear and present danger" test is appropriate only when a gag order has an effect on press coverage and access to a matter, id. at 427, no direct Supreme Court guidance on the issue exists, and the plurality in *Gentile*, as mentioned above, suggested a higher standard might be appropriate, at least as to the Court's inquiry here regarding Mr. Johnson's communications: "Petitioner was disciplined because he proclaimed to the community what he thought to be a misuse of the

prosecutorial and police powers.  Wide-open balancing of interests is not appropriate in this context."  501 U.S. at 1052.

However, as the government has not produced cited sufficient evidence upon which this Court could make a finding with respect to whether a gag order in this instance is appropriate, *Amicus* leave open, as is appropriate, the question of DUCrimR 57-6's standard of application here, because it cannot be constitutionally applied even under the lower "substantial likelihood" standard to justify the order requested in the Motion, and thus the canons of construction instruct that this Court should avoid the constitutional question.  *See e.g.*, *Slack v. McDaniel*, 529 U.S. 473, 485 (2000) ("Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of") (citation omitted).

3.      Applications of Legal Considerations to the Posture of the Motion

As evidence in support of the relief it seeks, the government references the existence of two websites, alleged statements by Mr. Johnson to media outlets, a Facebook "Page,", two "Youtube" videos, and an email purportedly sent from Mr. Johnson to his counsel, but carbon copying the government (that apparently was not available, in whole or in part, for public viewing until the government publicly filed the Motion on PACER), all of which appear to address purported motivations behind the indictment against the Defendant.  Gov't Br. at 2-10.  Collectively, these materials do not support a finding sufficient for this Court to justify imposition of a gag order under DUCrimR 57-6 because the government presumes rather than demonstrates that these materials "have a substantial likelihood of materially influencing a criminal proceeding or preventing a fair

trial or impeding the administration of justice." DUCrimR 57-6. As such, the government has done nothing to offer this Court evidence upon which to base "factual findings that publicity [complained of] would impair" any of the interests embodied in DUCrimR 57-6. *Quattrone*, 402 F.3d at 311.

The evidence referenced in the Motion merits careful review given the relief the government's Motion seeks.

According to the government, the EvilFTC.com website contains videos, articles and blogs about matters related to the District of Nevada civil case, and its chief evil is that it contains "false (and possibly defamatory) statements against Mr. Ward." Gov't Mot. at 2. There is no allegation in the government's motion that this site has another danger, such as putting forth evidence that would not otherwise come before a jury, not that such a showing in itself would be sufficient given the precedents and standards discussed above. Rather, the problem is with the site is alleged defamation of Mr. Ward and the fact that it contains messages maintaining Mr. Johnson's innocence and allegations of wrongful prosecution. As detailed in the law surveyed above, while these statements and communications may give rise to a possible civil action Mr. Ward may have against Mr. Johnson, they are nevertheless in complete conformance with Mr. Johnson's right to petition and to petition publicly. Absent a strong showing that it substantially threatens one of the interests enumerated in DUCrimR 57-6, this evidence does not on its face justify entry of a gag order because there is no data before the Court that anyone in the jury pool is likely to view it (and, if they did, why voir dire of the venire would not be sufficient protection).

The government next cites Mr. Johnson's statements to the media, which reflect his persistent statements of innocence, and his claims that he was threatened if he did not enter a plea

of guilty. *Id*. at 3-4. Fairly construed, they reveal someone who, rightly or wrongly, strongly believes they are unjustly accused, and who, rightly or wrongly, has concerns about possible prosecutorial misconduct. These are precisely the type of statements noted above, which the *Gentile* plurality thought beyond restriction through a balancing test, and the government has done nothing aside from describe them to suggest how they might hamper one of the interests covered in DUCrimR 56-7, let alone have a "substantial likelihood" of doing so.

Nearly the exact same is the case for "The Life of Jeremy Johnson" blog, as the government notes that it merely states Mr. Johnson's reluctance to plead guilty, as he felt he was being coerced and threatened. *Id.* at 6. The government does suggest that the blog posts an exhibit that was not admitted at Mr. Johnson's change of plea hearing, but it does not suggest that this one piece of evidence would threaten tainting of the jury pool sufficient that a gag order would be a necessary or narrowly tailored remedy if such a specter were even assumed.

The Facebook Page: "Unofficial Fan Page United States Attorney for the District of Utah" is characterized as using without authorization a photo of Mr. Barlow, perhaps, again, exposing Mr. Johnson to civil liability on some theory of tort, perhaps false light, but again the government does not suggest how such material implicates at all any interest subject to possible protection under DUCrimR 57-6. *Id*. at 5-6. The government also states that a number of potential witnesses express similar views on the Facebook Page, but the government does nothing to suggest that those view would impact DUCrimR 57-6 interests or suggest how a gag order covering such a spectrum of persons without notice would not be impermissibly vague, as pointed out by Mr. Johnson's counsel. Moreover, the government presents no evidence or argument that any party sought to be covered

22

by the gag order is actually responsible for the Facebook Page, and so its existence has no utility as evidence upon which this Court could fashion a gag order.  It is true, that posts by some the government says may be "potential witnesses" might be possibly defamatory but it is unclear why the Court should fashion an order that would subject such people to criminal contempt, when the statements are not directly related to the criminal action and, while surely critical of the prosecution, not demonstrably so widely viewed that they endanger any interest recognized by DUCrimR 57-6.  Indeed, if any of those posting were called as witnesses, their posted material could be used for impeachment or other purposes, and thus it is not clear that the material, should such persons be called, would not be admissible as evidence for some reason.  Finally, the government argues that the "existence of this Page has caused substantial confusion in the community, with many, including public officials and media outlets, believing it to be actually connected with the United States Attorney's Office[,]" but this assertion has no evidence or citation for foundation and, more importantly, the government makes no argument that such "confusion" has any relation to an interest covered under DUCrimR 57-6. Gov't Mot. at 7.

With respect to the "Youtube" videos, the government again suggests that the material alleges Mr. Ward threatened to indict Mr. Johnson's family members. *Id.* at 7-9.  To the extent that it articulates that "[Mr.] Barlow [is] unaware of threats made[,]" it seems to contain a petition for redress of grievances, but we are left to wonder who has made them.  *Id*. at 8.  Yet again, the government advances no evidence to show that such communications could substantially implicate an interest protected by the rule, and, moreover, as just mentioned there is no clear allegation regarding who is responsible for the video, and thus the material is of no value to the Court in

fashioning an order that could meaningfully identify those individuals subject to coverage.

Finally, the "January 25, 2013 Jeremy Johnson Email" Mr. Johnson sent to his counsel and carbon copied Mr. Ward, alleges that government is threatening people close to Mr. Johnson, that Mr. Johnson seeks to expose such wrongdoing, and indicates an intent to "plead for help from our elected officials." *Id*. at 10.  As the email was not public until the government's filing which attached it as an exhibit, Gov't Mot., Exh. "R", it can serve as no basis for this Court to make a finding that it constitutes publicity that should prompt this Court to issue a gag order.

Taken individually and taken together, the materials covered in the government's motion offer little or nothing in the way of demonstrating that any interest covered by DUCrimR 57-6 is in substantial likelihood of being threatened.  As such, the evidence does not meet the government's burden under the rule, and it certainly does not justify the issuance of an order limiting any restriction on the types of expressions exercised by the accused, his counsel, or any other citizens.

## CONCLUSION

As discussed throughout this brief, the right to petition, to insist on one's innocence, and to complain when one feels indictment is improper "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and the occasionally "erroneous statement is inevitable." *Sullivan*, 376 U.S. at 270-71.  Yet "[t]he First Amendment requires that we extend substantial breathing space to such expressions, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill would-be critics of official conduct from voicing their criticism." *McDonald*, 472 U.S. at 486-87

(internal quotations, citations and ellipses omitted).  The materials cited by the government do not meet the burden sufficient to justify issuance of the order they seek under the standards of DUCrimR 57-6.  The Motion of the government should therefore be denied.

Submitted this 28th day of February, 2013.


_____/s/Parker Douglas_____
Parker Douglas
*Counsel Pro Bono*


_____/s/Kent R. Hart_____
Kent R. Hart
Executive Director

**CERTIFICATE OF DELIVERY**

I hereby certify that a true and correct copy of the foregoing was electronically mailed via the Court's E/CMF system to all parties named below on this 28th day of February, 2013:

David B. Barlow
United States Attorney

Carlie Christensen
Felice John Viti
Assistant United States Attorneys

185 S. State Street, Suite 400
Salt Lake City, Utah  84111


Ronald J. Yengich
A. Chelsea Koch
Earl G. Xais
Yengich, Rich & Xais
175 E. 400 S., Ste. 400
Salt Lake City, Utah 84111

____/s/Parker Douglas_____
